**UNITED STEELWORKERS OF AMERICA, AFL-CIO, Plaintiff, v. DOYLE et, Defendants.**

Common Pleas Court, Mahoning County.

No. 153206.   Decided 1958.

Arthur J. Goldberg, David E. Feller, Washington, D. C., Herschel Kriger, Canton, Robert M. Murphy, Youngstown, for the plaintiff.

Manchester, Bennett, Powers & Ullman, William T. Swanton, Paul J. Fleming, Youngstown, Frank C. Manak, Cleveland, of Counsel, for United States Steel Corporation, The Youngstown Sheet & Tube Company and Jones & Laughlin Steel Corporation.

H. C. Lumb, Cleveland, Harrington, Huxley & Smith, David E. Jones, Youngstown, for Republic Steel Corporation.

Hon. William Saxbe, Atty. Genl., John W. Hardwick, Eugene P. Everhart, Louis H. Orkin, A. L. Greenspun, Asst. Attys. Genl., Columbus, for defendants James R. Tichenor, Administrator, John L. Doyle, Albert E. McCully and George E. Bentfeld.

Joseph P. Kinneary, Columbus, for defendant Donald R. Smith.

Robins, Metcalf & Fisher, Richard B. Metcalf, Columbus, for defendant Richard H. Ward.

John J. Chester, Jr., Robert P. Dunkin, Columbus, for defendant The C. E. Morris Company.

**AMICI CURIAE:**

William T. Gossett, Joseph A. O'Reilly, Richard A. Fellrath, Dearborn, Michigan, for Ford Motor Company.

Harold J. Fast, Akron, for The B. F. Goodrich Company.

Edward C. Foster, Akron, for The Goodyear Tire & Rubber Company.

David Clayman, Columbus, for The Ohio CIO Council.

Metzenbaum & Schwartz, Harold M. Metzenbaum, Cleveland, for The Ohio State Federation of Labor.

Clarence D. Laylin Columbus, for The Ohio Chamber of Commerce.

Fred J. Milligan, Columbus, for Ohio Information Committee, Inc.

David Clayman, Columbus, Leonard Lesser, Washington, D. C., for Industrial Union Department of the AFL-CIO.

388

Hammond & Hammond, Robert Hammond, Youngstown, for Lustig's Inc., The Wilkins Leonard Hardward Company, Century Food Markets Company, Charles Livingston & Sons, Inc., and The Moyer Manufacturing Co.

Benjamin C. Sigal, Bert Diamond, Washington, D. C., for International Union of Electrical, Radio & Machine Workers, AFL-CIO.

**OPINION**

By MAIDEN, Jr., J.

No formal opinion having been rendered upon the action of the court overruling the motions to quash service and overruling the demurrers, counsel are entitled to a discussion of the applicable law and the reasons for the rulings. This is also in point upon the plea of lack of jurisdiction set up in the answers of the Administrator and the Deputies.

Sec. 2307.35 R. C., reads in part as follows:

"Actions for the following causes must be brought in the county where the cause of action or part thereof arose;

"* * *

"(B) Against a public officer, for an act done by him in virtue or under color of his office; or for neglect of his official duty;

"* * *"

This section first appears in the statutes of Ohio in the Code of 1853 (51 **Ohio Laws 57, at page 64, Sec. 47** effective July 1, 1953). At that time our state was mostly agricultural, some commerce and industry were just in their infancy. The railroads had shortly before put in their appearance, but transportation was for the most part by canal and stagecoach and covered wagon for freight and families moving to the West. The conception, taken from the Roman Law in the past fifty years, of the State Sovereign acting through administrators, bureaus and commissions with branch offices in the principal cities, certainly never entered into anyone's mind; at any rate it is safe to say that the Legislature in 1853 did not have any such legislative foresight in enacting the law. The statute, however, being clear and unambiguous, must be applied by the courts as written without regard to changed conditions.

It is the law that this section confers an absolute right upon such an officer of which he may not be deprived, and the joinder of co-defendants who reside **outside the County where the cause of action arose** does not deprive the officer of his right under this section. **Meeker v. Scudder, 108 Oh St 423, 140 N. E. 627; State, ex rel. Barber, Prosecuting Attorney, v. Rhodes, Auditor, et al, 165 Oh St 414 (1956), 136 N. E. 2d, 60,** discussed in June, 1957 Western Reserve Law Review, page 270. In passing it should be noted that the court in the later case on page 421 states: "The locus of that debt, if there be one, must be the County where the official duties of **the officers representing the State of Ohio** as to that matter are performed **or carried on** (emphasis mine), **State, ex rel. Stine v. Atkinson, Admr. of Bureau of Unemployment Compensation, et al, 136 Oh St 72, 23 N. E. 2d 637. Stine, Appellant v. Atkinson, et al., Appellees, 69 Oh Ap 529, 44 N. E. 2d 372.**

There is no specific provision in the Unemployment Compensation Law (§§4141.01 to 4141.99 R. C.), limiting actions against the administrator to Franklin County, as in the case of the **State Highway Director, State, ex rel. Jaster, Director of Highways, v. Court of Common Pleas, 132 Oh St 93, 5 N. E. 2d 174.**

On the other hand, if the State officer acts within the local county upon the gist of the action but through a duly authorized agent in that county, then he is actually legally present in the latter county and may be therein sued. **State, ex rel. Belknap v. Board of Elections, 3 Oh Ap 190; State, ex rel. Betts v. Bower, 14 Abs 716; State, ex rel. McDonald v. Supt. of Building & Loan Associations, et al., 134 Oh St 75, 15 N. E. 2d 962; Riegel v. State, 20 Oh Ap 1, 151 N. E. 784.**

**Sec. 4141.02 R. C.,** creates the Bureau of Unemployment Compensation, and provides for the appointment of the administrator of the bureau; portions of that section read:

"* * *

"Any investigation, inquiry or hearing, which the administrator is authorized to hold or undertake may be held or undertaken by or before one of his deputies and every **order made by one of his authorized deputies is the order of the Administrator.** (Emphasis mine.)

"The administrator shall keep and maintain his principal office in the city of Columbus, and he shall establish and maintain branch offices in such other cities of the State as he finds necessary and as are approved by the governor.

"* * *

"All disbursements from the unemployment fund shall be paid by the treasurer of the state on vouchers authorized by the administrator and signed by him or bearing his facsimile signature and that of a deputy of the administrator charged with the duty of keeping the account of the unemployment fund and **with the preparation of vouchers for the payment of benefits to the persons entitled thereto.**" (Emphasis mine.)

Applying these principles to the allegations of the petition, the motions to quash service and the demurrers were properly overruled. It should be particularly noted that if the order be made in Mahoning County by his authorized deputy, under the provisions of the above statute, it is his order. The petition alleges that the orders were so made by his authorized deputy in Mahoning County.

Exhibit H-1 is a photostat of a form headed: **"ADMR'S DETERMINATION OF CLAIM FOR BENEFITS,"** and is the claim of one Joseph Posey of Youngstown, Ohio, mailed from the Youngstown Office of the Bureau on September 23, 1957, an employee of Republic Steel Corporation, and the issue being as stated thereon "Receipt of SUB payment," the application sections of the Code being set forth as §§4141.01 (H), 4141.35 and 4141.30 (C) R. C. This was signed by "J. L. Doyle, Claims Supervisor." The determination is as follows:

"Claimant was paid unemployment benefits in the amount of $39.00 for week ending September 7, 1957. The Bureau then was notified that the claimant had received a private supplemental payment under his company-union Supplemental Unemployment Benefit Plan (SUB). The terms of the SUB Plan establish that this payment was based on claimant's employment with this employer and was paid with respect to the same week for which state benefits were paid. Therefore, under the Ohio Law, this payment constitutes remuneration in the amount of $31.00 per week which must be deducted from the weekly benefits already paid for the week shown above.

"Since the claimant was paid $39.00 for this week, the deduction of this remuneration now entitles the claimant $10.00 per week. As a result the claimant was overpaid $29.00 for the week ending September 7, 1957. Claimant is hereby required to repay this amount to the Bureau."

This determination H-1 was withdrawn by the local office on the same day it was issued and Exhibit H-2 was issued and substituted therefor. It is a similar form, dated, signed and mailed the same as the preceding one, but the issue was "Total or Partial Unemployment"

and the applicable law was stated "See Facts." It appears that the facts, law and conclusions were dictated from the Columbus office by telephone either verbatim or in substance. The "Facts" are substantially as above and a careful analysis of the law as claimed by the administrator and Mr. Doyle was made covering 3 pages; the decision is the same as in Exhibit H-1.

The Court finds that the action of the deputies in the local office was in accordance with previous instructions of the Administrator and that other claimants employed by different corporations in Mahoning County were issued similar determinations from the Youngstown office signed by defendant Doyle or defendant Bentfeld.

From all this it is clear that the administrator in the doing of the acts complained of is legally present in Mahoning County and hence the cause of action arose here. Every order made by his authorized deputies in this county is his order and made by him by operation of the statute right here in this county. It is urged by the administrator that "this statute limits, and does not expand the court's jurisdiction over him" and "the situs of that order can only be the principal office of the administrator, Columbus, Ohio." That is to say, that when the authorized deputy signs an order in Mahoning County, the signing is to be considered as having been done in Franklin County; the effect of that argument is to admit that the administrator in the legal sense was present in the local county at the moment of signing, thus giving rise to the cause of action. It should be kept in mind that this is not the situation where an order of a branch office of a state board or bureau must first have approval of the main office at Columbus before it becomes effective. Here, so long as the local deputy acts within his authorization, his action is legally effective upon signing the order; the rights of all parties involved are fixed as of that moment, not by administrative fiat but by legislative mandate.

It is urged that §4141.35 R. C., controls, the pertinent part being:

"If the administrator finds that an applicant for benefits has been credited with a waiting period or paid benefits to which he was not entitled for reasons other than fraudulent misrepresentation, the administrator shall within three years by order cancel such waiting period and require that such benefits be repaid in cash to the bureau or be withheld from any benefits to which such applicant is or may become entitled before any additional benefits are paid."

Sec. 4141.28 R. C., entitled: "Claims for Benefits; determinations; appeal to board," provides that claims "shall be filed with a deputy of the administrator," that the "administrator or his deputy" shall examine the applications, that the "administrator or his deputy" shall examine the first claim for benefits, that the "administrator or his deputy" shall determine the reason for separation, etc., and that the "administrator or his deputy" shall act as to any other claim filed, etc. It is argued that the designation of the administrator only in §4141.35 R. C., above indicates an intention that this act of withholding benefits can only be done at the main office in Columbus. Perhaps it could be so done, but the evidence in this case indicates clearly a directive of policy by the ad-

ministrator to his branch offices with the action itself taken in the local office and orders issued there by duly authorized deputies. The true construction of the statute would seem to be a grant of power to the administrator but in the execution of that power he may act through his deputies, provided they are authorized by a directive or other instruction. If that be not so, then his acts complained of in this case are done without legal authority under the statute.

The acts of defendants Doyle, Bentfeld and McCully, being official acts done by them pursuant to authority granted to them by the administrator, and done in Mahoning County, make them proper and necessary parties to this action.

Sec. 2307.19 R. C. reads:

"Any person may be made a defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of a question involved therein."

Sec. 2703.04 R. C. provides, in part:

"When the action is rightly brought in any county, according to §§2307.32 to 2307.40, inclusive, R. C., a summons may be issued to any other county against one or more of the defendants at the plaintiff's request; * * *."

It is of course clear that this section is general in its scope and has no application where a defendant is a public officer and is sued as such, in the absence of facts bringing the case within the operation of §2307.35 (B) R. C. State, ex rel. Barber v. Rhodes, Admr., supra, at page 421. But finding as above set forth as to the allegations of the petition, the facts on the merits and the law, there is no misjoinder of parties defendant.

It is next urged that an action for a declaratory judgment is not the proper remedy, but that the Posey case and similar cases should be appealed through the various steps provided for appeal in §4141.01 et seq, R. C. From the pre-trial stipulation it appears that a request for reconsideration of that determination was made to the administrator on September 24, 1957, which determination was affirmed on October 8, 1957 over the defendant Administrator's signature; and that on October 15, 1957, Joseph Posey filed his "Notice of Appeal from Administrator's Decision on Reconsideration" to the Board of Review; no further proceedings have been had on the same. It also appears that the other claimants filed their requests for reconsideration to the Administrator, and no further proceedings have been had thereon.

The stipulation also provides as follows:

"(1) The Plaintiff, United States Workers of America, AFL-CIO, has approximately 1,200,000 members working in and about steel mills and steel fabricating factories in the United States and Canada, of whom approximately 150,000 are employed in the State of Ohio and approximately 36,000 are employed in Mahoning County, Ohio. In addition to its members, as aforesaid, the Plaintiff represents other employees, not members, pursuant to the provisions of the National Labor Relations Act.

"(2) Plaintiff is the collective bargaining representative under approximately 350 collective bargaining agreements with Ohio employers covering approximately 150,000 employees and is a party to approximately 125 contracts in Ohio providing for Supplemental Unemployment Benefit plans (hereinafter referred to as SUB plans) covering approximately 125,000 employees, which contracts provide for substantially the same SUB plans as do the contracts with the defendant corporations. In District 26 of said Union Plaintiff is the collective bargaining representative under approximately 125 collective bargaining agreements covering approximately 63,000 employees, of which approximately 90 covering aproximately 60,000 employees provide for SUB plans in substantially the same form as do the contracts with the defendant corporations. District 26 of said Union covers Mahoning, Trumbull, Ashtabula, Lake and Columbiana (partly) Counties. In Mahoning County there are approximately 68 collective bargaining agreements covering approximately 36,000 employees including 43 SUB plans covering approximately 35,000 employees. Approximately 30,000 members of the Plaintiff Union are employed by the Defendant corporations in Mahoning County and approximately 50,000 in the State of Ohio, and all of such employees are covered by the SUB plan set forth in the petition."

It is further stipulated that it was the expectation of Plaintiff and Defendant corporations if payments were made under the SUB plans to persons laid off from employment in Ohio for weeks beginning on and after September 1, 1957, such payments would be ruled to constitute remuneration with respect to such weeks, but it was also their expectation "that in accordance with their understanding of the usual practice in other cases, immediate restitution would not be required and that State unemployment benefits for such persons for subsequent weeks would not be reduced or denied in order to achieve restitution until the claim for repayment was fully adjudicated"; that accordingly the SUB plans went into effect in Ohio on September 1, 1957 and benefits were paid thereunder for the first week in September; that upon the action of the administrator in ordering immediate restitution by deduction, interim agreements were entered into between the plaintiff and the corporate defendants "whereby pending a final decision by the Courts, no supplemental unemployment benefits would be paid to employees laid off from employment in the State of Ohio except in the case of employees who would not be entitled in any event to State benefits"; that the trustees referred to in the SUB plans have been appointed as provided therein, and the funds as therein provided have been established and contributions fully made in compliance thereto.

Sec. 2721.02 R. C. is as follows:

"Force and effect of declaratory judgments. Courts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect. Such declaration has the effect of a final judgment or decree."

Sec. 2721.03 R. C., so far as pertinent to this case, reads:

"Any person interested under a * * * written contract * * *, or whose rights, status, or other legal relations are affected by a statute * * * may have determined any question of construction or validity arising under such instruments, statute, * * * contract, * * * and obtain a declaration of rights, status, or other legal relations thereunder."

Sec. 2721.09 R. C., provides that whenever necessary or proper, further relief based on a declaratory judgment or decree previously granted may be given. Also, §2721.13 R. C., requires that the sections of the Declaratory Judgment Act "shall be liberally construed and administered."

In American Life & Accident Ins. Co. v. Jones, Admr. of Bureau of Unemployment Compensation, 152 Oh St 287, 89 N. E. 2d 301, the Supreme Court in the 2nd syllabus lays down the rule:

"2. Although the Uniform Declaratory Judgments Act, §12102-1 et seq, GC, is not available to circumvent an adverse decision of an administrative agency, an action for a declaratory judgment may be entertained by a court in the exercise of its sound discretion, where the action is within the spirit of the declaratory judgments act, a real justiciable controversy exists between adverse parties, and speedy relief is necessary to the preservation of rights which may otherwise be impaired or lost. (Schaefer v. First National Bank of Findlay, 134 Oh St 511, and Radaszewsky v. Keating, Extrx., 141 Oh St 489, approved and followed.)"

See also 16 O. Jur. 2d, page 639, para. 9.

If Posey were the plaintiff here relief by a declaratory judgment should be refused for the reason above quoted. But the plaintiff union cannot be a party in the administrative tribunals and Posey can discontinue his appeal at any time; that is his statutory right. On the theory contended for, each of the approximately 80,000 employees of the defendant companies in Ohio (about 30,000 in Mahoning County) represented by plaintiff should accept SUB and then appeal the administrator's ruling through the various statutory stages and finally into the Court, and in the meantime his supplemental unemployment benefits would each week be deducted from his State check, leaving for future years the final adjudication of his rights. Plaintiff states in its brief that as of December 31, 1957, approximately half a million dollars in SUB benefits have been withheld from applicants laid off from employment by the four defendant corporations in Mahoning County, and approximately one million dollars over the entire state. Add to this the unnamed amount of withholdings over the state by companies having similar SUB plans, as indicated by the briefs amici curiae, and the conclusion is clear that there is an imperative need for speedy relief to preserve rights that may be otherwise lost or impaired. There can be no question that this action is within the spirit of the Declaratory Judgment Act and a real justiciable controversy exists between adverse parties. The last requirement of the statute is that the party seeking relief must show that he has a legal interest in the controversy, which of course cannot be questioned here. The case is, therefore, particularly one for a declaratory judgment.

It is urged that the Court should not entertain the action because of a claimed defect of parties, in that the Board of Review is not made a party to the case. Sec. 2309.08 R. C., provides as one of the specific

grounds of demurrer: "There is a defect of parties plaintiff or defendant." By virtue of §2309.10 R. C., the objection is waived if not raised specifically in a demurrer, where the defect appears upon the face of the petition. The question not having been properly raised, must be held to be waived. **Sears & Nichols Corp. v. Squire, Supt. of Banks, 132 Oh St 140, 5 N. E. 2d 486.** Aside from the procedural matter, however, it does not appear to the Court that the absence of the Board of Review is material. It is present through the Attorney General. **Babin v. City of Ashland, 160 Oh St 328, 116 N. E. 2d 580.** The Board is a judicial body as respects adjudication of claims. The justiciable controversy here is between the administrator and the plaintiff and defendants. To be sure, §2721.12 R. C. requires that "all persons shall be made parties who have or claim an interest which would be affected by the declaration. No declaration shall prejudice the rights of persons not parties to the proceeding. * * *." Also §2721.07 R. C., provides that the Court "may refuse to render or enter a declaratory judgment or decree when such judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding." Such a judgment or decree in this case would "terminate the uncertainty or controversy giving rise to the proceeding." The impact, if any, of the judgment or decree upon other tribunals in the state, including the Board of Review, is not to be considered in determining the question as to whether the action should be entertained.

Coming now to the first question as to whether §§4141.01-4141.99 R. C., forbid the operation of the SUB Plan, there is no express statutory prohibition and nothing can be implied to that effect from the language of the statute. The question rather is whether the administrator has the right to reduce the amount of state benefits by the amount the employee receives under the Plan, i. e. whether the latter constitute, (1) "remuneration," and (2) with respect to the same week or period for which state benefits are paid. The issue is raised by one or more of the intervening defendants as to a public policy in Ohio forbidding the operation of such SUB plans,—that will be discussed later.

The nature of the SUB plan and its bar essentials is set forth in the statement of the pleadings above,—the Plan itself covers 20 printed pages, 5" x 7", 8 point type. Such a Plan is different from the guaranteed wage plans under which the employer purchases a worker's services, either actual or stand-by on an annual basis. The SUB plan pays benefits **only for unemployment,** just as does the Ohio unemployment insurance law itself. Supplementing the facts stated in the petition the following should be added: No contributions are made to the fund with respect to periods for which an individual receives supplemental unemployment benefits.

Payments from the fund, unlike all forms of compensation paid by the employer, **furnish no basis for accumulating valuable employment rights such as pension credits, vacation pay, holiday pay, health and medical benefits and other forms of insurance.** In no case are the benefits treated by the parties as "wages" and the plan so specifically provides.

The trust fund is the sole source of benefit payments. The Company is required to make the required payments to the fund but is in no way liable, through additional contributions to the fund or otherwise,

for the payment of benefits should the assets of the fund prove insufficient. No worker has any claim against any contributions or other monies in the trust fund. Neither a claim for benefits nor the unemployment benefit, when due, is assignable or subject to garnishment or other legal process.

To be eligible for a benefit a worker must be registered for employment with the State employment service. All requirements of the State unemployment compensation law designed to limit the payment of benefits to workers who are "unemployed" and genuinely available for any suitable work are incorporated as eligibility requirements for the receipt of unemployment benefits from the trust fund. A specific provision denying benefits to workers who refuse to accept suitable work with other employers is incorporated in the plan.

While a prior period of service with the employer is required in order that a worker be eligible for benefits, the existence of such prior relationship does not establish a worker's eligibility for benefits. A worker may have worked many years for the employer establishing the plan, be laid off by such employer, and still receive no benefits. **Eligibility is dependent on his meeting conditions of entitlement during the week of unemployment for which the benefit is paid.** During this period of unemployment, a worker must be able to work and available for work and must, like all unemployment insurance claimants, continue to meet specific periodic reporting requirements. He must satisfy all the other specific conditions of eligibility set forth in the plan during the week for which the benefit is paid. A worker is ineligible to receive a benefit from the trust fund if he is ineligible to receive or is disqualified from receiving State unemployment benefits.

Similarly, although employer payments to the fund are measured in part by total hours worked by all employees such contributions are not allocated to the account of any workers. Nor does eligibility for benefits depend on whether contributions have been made with respect to hours worked by a specific worker. A worker may receive benefits although no contributions have been made during his entire period of employment with the company (contributions are suspended when the trust fund reaches a specified level); conversely a worker on the basis of whose employment contributions have been made to the fund may not be eligible to receive benefits when unemployed, because of his failure to satisfy the conditions of eligibility during his period of unemployment or because the Fund is then below a certain specified level.

Upon the termination of the Plan the assets remaining in the Fund shall be used until exhausted to pay weekly benefits to applicants laid off or thereafter laid off in the order each week, of the respective dates as to which they were laid off. A worker has at no time any vested right in any part of the Fund, at least until involuntarily unemployed and then only upon meeting all conditions and terms of the State Unemployment Compensation Law as well as the provisions of the Plan.

Sec. 4141.29 R. C., provides who are eligible for benefits, the first sentence being:

"Each eligible individual shall receive benefits as compensation for

loss of remuneration due to total or involuntary partial unemployment in the amounts and subject to the conditions stipulated in §§4141.01 to 4141.46, inclusive, R. C."

"Remuneration" is defined in §4141.01 (H) R. C.: "Remuneration means all compensation for personal services, including commissions and bonuses and the cash value of all compensation in any medium other than cash."

Sec. 4141.01 (M) R. C., provides:

"An individual is 'totally unemployed' in any week during which he performs no services and with respect to such week no remuneration is payable to him."

Sec. 4141.01 (N) R. C., provides:

"An individual is 'partially unemployed' in any week if, due to involuntary loss of work, the total remuneration payable to him for such week is less than his weekly benefit amount."

Sec. 4141.35 R. C., second paragraph reads:

"If the administrator finds that an applicant for benefits has been credited with a waiting period or paid benefits to which he was not entitled for reasons other than fraudulent misrepresentation, the administrator shall within three years by order cancel such waiting period and require that such benefits be repaid in cash to the bureau or be withheld from any benefits to which such applicant is or may become entitled before any additional benefits are paid."

So that if the weekly benefit under the SUB Plan is "remuneration," and the remuneration is payable to the employee for the week during which he is totally or partially unemployed, then the administrator is not only right but duty bound under the statute to apply the SUB as a credit against the state allowance, just as in the case of any other deductible remuneration which the individual might receive during that week.

Wages are defined under §4141.01 (G) R. C., as follows:

" 'Wages' means remuneration paid to an employee by each of his employers with respect to employment; except that * * *."

"Employer" is defined in §4141.01 (A) R. C., as meaning any individual or type of organization, etc., "who subsequent to December 31, 1936, had in employment three or more individuals at any one time within in a calendar year."

Under (B) Employment means "service performed for wages under any contract of hire, written or oral, express or implied, including * * *."

It is thus readily apparent that remuneration is a much broader term than wages, the latter being limited by definitions of the words used to define it. They are not synonymous under the Ohio law but are in some states. Under our statute "Wages" is all important in determining the amount in dollars the employer pays into the State Fund, i. e. the employer's "contribution" (§4141.25 R. C.) and in fixing the amount of "benefits" (§4141.30 R. C.), as well as some other sections of the statute. The question here is not whether the employer's payments in the SUB Trust Fund are wages; the question before this Court is whether the benefits paid out of that fund are "compensation for personal services."

It is to be noted that the amount of the benefit under SUB is not measured by the amount of service put into employment. SUB is based upon the insurance principle; the involuntarily unemployed worker gets a larger sum than he would if he just got back his "premium." The latter is the basic concept of the Eaton Plan. Under that system the payments by the employer into the Fund are earmarked by proper bookkeeping to each employee; he may withdraw his credits upon leaving the employer or upon becoming unemployed, and under some other conditions. It is in effect a collective savings plan where each man has allocated to him his certain reserve.

The administrator has approved the Eaton plan; the amount of contributions by the employer are held to be wages and hence the withdrawals by the workers from the trust fund are held not to be remuneration under (H). Being wages and taxed as such against the employer, they are not remuneration at least during the week of unemployment.

In the case at bar the administrator contends that the benefits under SUB would not be paid out except for the collective bargaining agreement, and hence they arise out of employment; they are part of the whole contract of getting labor to perform, and hence benefits are remuneration. To be sure they arise out of the employment relationship, but the question is are they compensation **for personal services?** Does the employee involuntarily laid off receive the SUB for personal services. Rather does he receive it not for personal services rendered but because he is involuntarily prevented from rendering personal services? It is urged that the employee under the Plan must report to the employer if required under Rules and Regulations to be promulgated under the Plan, thus conserving time and energy, and must have made application and complied with the "applicable state system" by registering and reporting and has not refused to accept suitable employment, etc., and that these requirements constitute the rendering of "personal services." Are all these requirements to be considered as the rendition of personal service for the employer or are they not rather to be considered as conditions and prerequisites to the employee for his own benefit in order to secure compensation for loss of remuneration due to unemployment (§4141.29 **R. C.**, quoted above)?

The Ohio Unemployment Compensation Act was enacted in 1936, "as a part of a national plan of unemployment compensation and social security" **(116 O. L. Pt. 2, Sec. 34, P. 286, §1345-34 GC)**. The Federal legislation contains no definition of "remuneration"; it defines "wages" as "all remuneration for employment * * *," Secs. 811 (a) and 907 (b), now Secs. 3121 and 3306 (chapter headed "Employment taxes"), Tit. 26 U. S. C.; and "employment" as "any service, of whatever nature, performed by an employee for the person employing him," Secs. 3121 and 3306, supra (by amendment, the words "of whatever nature" have been dropped). It is argued that because "wages" and "employment" are defined substantially the same in the Federal and Ohio State laws, Social Security Board v. Nierotko, 66 S. Ct., 637, 327 U. S. 358, 90 L. Ed. 718, 162 A. L. R. 1145 (1945), controls. This case involved the question whether "back pay" which was granted to an employee under the Na-

tional Labor Relations Act for a period of time during which he was wrongfully separated from his job should be treated as wages under the Social Security Act, which defines wages as "remuneration for employment" and employment as' "any service performed by an employee for his employer." The Court held in the affirmative. Quoting from the opinion:

"The petitioner urges that Nierotko did not perform any service. It points out that Congress in considering the Social Security Act thought of benefits as related to 'wages earned' for 'work done.' We are unable, however, to follow the Social Security Board in such a limited circumscription of the word 'service.' The very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind, import breadth of coverage. They admonish us against holding that 'service' can be only productive activity. We think that 'service' as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer."

As pointed out in the opinion, "the very words 'any service . . . performed . . . for his employer,' with the purpose of the Social Security Act in mind, import breadth of coverage." We are now being asked to use that reasoning of the Court (the decision being rendered in 1945), which was intended to effect a liberal and broad coverage, to give a strict and narrow interpretation to the Ohio statute, which was enacted as a part of and designed to accomplish the same purpose as the same national plan. What is remuneration under (H) may be entirely different from what is "wages" under the Federal Act, depending on the factual situation involved.

It is claimed that court decisions, holding that vacation pay received by a claimant subsequent to the termination of his employment was remuneration, are determinative of this case. **Collopy v. Smith, et al.,** Court of Appeals, Athens County, decided · Dec. 14, 1950 so holds as to vacation pay, the court stating that "it cannot be said that all remuneration growing out of the employee's contract of employment was fully terminated until all of the time therein provided for him for which he was to receive remuneration, whether he worked or not, was completed." So also in **Reid v. Board of Review, 155 Oh St 6 (1951),** 97 N. E. 2d 31, a claimant was denied unemployment benefits for a week in which she did not work, but for which she did receive vacation pay. It can be readily seen that vacation pay requires a different treatment than SUB. In the instance of vacation pay an employee is paid for not working—he is not unemployed.

We come now to an analysis of the statute to determine the legislative intent. The preamble to the original Act **(116 O. Laws, Pt. II, p. 286)** reads.

"To establish a system of **unemployment insurance,** without liability on the part of the State of Ohio, to create an unemployment insurance commission, to provide for employment offices, and to repeal §§154-45a, **154-45b** and **154-45c GC,** and to declare an emergency." (Emphasis mine.)

Sec. 34 states that:

"This act is enacted as a part of a national plan of unemployment compensation and social security * * *."

Many amendments were made to the original act through the intervening years but no change was made in the above declared purpose, but as time went on the various amendments referred to the system as one of unemployment compensation. Extensive changes in the law were made by Amended Substitution Senate Bill No. 187, effective on Oct. 1, 1941, **119 O. Laws, 821,** the particular section concerned in this case being found on page 826 and being the addition of paragraph (1); (f), now (H) was amended to read as follows:

" 'Remuneration' means all compensation * * * for personal services, including commissions and bonuses and the cash value of all compensation * * * in any medium other than cash. The reasonable cash value of compensation * * * paid in any medium other than cash * * * shall be estimated and determined in accordance with rules prescribed by the administrator * * *; provided the term 'remuneration' shall not include:

"(1) The amount of any payment with respect to services performed after December 31, 1940, to, or on behalf of an individual in his employ under a plan or system established by an employer which makes provision for individuals in his employ generally or for a class or classes of such individuals (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment), on account of (A) retirement, or (B) sickness or accident disability or (C) medical and hospitalization expenses in connection with sickness or accident disability, or (D) death, provided the individual in his employ (i) has not the option to receive, instead of provision for such death benefit, any part of such payment or, if such death benefit is insured, any part of the premiums (or contributions to premiums) paid by his employer, and (ii) has not the right, under the provisions of the plan or system or policy of insurance providing for such death benefit, to assign such benefit or to receive a cash consideration in lieu of such benefit either upon his withdrawal from the plan or system providing for such benefit or upon termination of such plan or system or policy of insurance or of his services with such employer."

This is substantially the same as **paragraph (H)** in §4141.01 R. C., except that the second sentence beginning with "The reasonable cash value" and ending with "include" is made a second paragraph. No significance should be attached to this as it is merely a change in typographical setup.

These 1941 amendments were made necessary by changes in the Federal laws. It was provided that before the state could participate in the Federal system, the law of the state must first be approved under the statute which is now Sec. 1603 of Title 26, U. S. C. A.; that the state must first be certified as eligible by the Secretary of Labor, Sec. 1103 same; and that that officer was to make no certification for payment to any state unless he finds the law of such state * * * includes provision for:

"(8) Effective July 1, 1941, the expenditure of all money received pursuant to Section 502 of this title solely for the purposes and in the amounts found necessary by the Secretary of Labor for the proper and efficient administration of such state law;"
and other provisions.

For these reasons the legislature was required to amend the statute to conform to the Federal act, and in accordance therewith enacted the Federal definition of "Wages" now found in 42 U. S. C. A., Sec. 409, into our statute, but tacked it on as (1) in what is now paragraph (H); that Federal definition reads:

"For the purposes of this sub-chapter, the term 'wages' means * * * remuneration paid after 1950 for employment, including the cash value of all remuneration paid in any medium other than cash; except that, in the case of remuneration paid after 1950, such term shall not include—"

"(b) The amount of any payment (including any amount paid by an employer for insurance or annuities, or into a fund, to provide for any such payment) made to, or on behalf of, an employee or any of his dependents under a plan or system established by an employer which make provision for his employees generally (or for his employees generally and their dependents), on account of (1) retirement, or (2) sickness or accident disability, or (3) medical or hospitalization expenses in connection with sickness or accident disability, or (4) death; * * * *"

The same definitions in substantially the same language appear in the chapter dealing with employment taxes, 26 U. S. C. A. Sec. 3306.

There are thus six possible interpretations of (H) with relation to subparagraph (1) thereof:

First: That the Legislature adopted (1) merely and solely to comply with the Federal requirement above quoted as to "Wages," and with no intent to change the preceding meaning of (H) as it was prior thereto, except as to wages earned from a non-covered employer.

Second: That in adopting (1) recognized that the administrator might charge back against weekly unemployment benefits any amounts received by the worker by way of retirement, sick or accident benefits, etc., this under a broad construction of "compensation for personal services" and hence acted to avoid this.

Third: That (1) was adopted merely as a precautionary measure taken against misinterpretation of (H).

Fourth: That the Legislature intended to class all types and kinds of compensation however immediate or remote as remuneration, excepting the specific ones mentioned in (1).

Fifth: That without (1) fringe benefits mentioned in (1) would be compensation, the reasonable cash value of which **plans** or **arrangements** would be fixed by the administrator under rules and hence all other fringe benefits than those mentioned in (1) are to be compensation to the extent of the fair cash value of said **plans** or **arrangements** as fixed in accordance with the requirements of the second paragraph of (H).

Sixth: That the determination, if possible at all, of the reasonable

cash value of the items in (1) and similar items in the future was of such a degree as to be impracticable and unreasonable, and therefore not to be considered remuneration.

As to the first, the Court is of the opinion that the mandatory requirements of the Federal law were a compelling factor in all the 1941 amendments, for the law had to have the approval of the proper Federal authorities before Ohio could participate in the Federal plan. At least as to (H) this was a compelling factor. This has the effect of leaving the interpretation of (H) to whatever the interpretation of the whole unemployment act would require.

As to the second, it is clear that there could be no legislative intent to classify the fringe benefits, except as to death in the instance of arrangements therein excepted, as compensation for personal services. In the instances excepted the element of life insurance and its attendant complications are involved.

As to the third, the legislative intent was to carry the provisions of the Federal law, above quoted, into our statute and evidently placed it in (H) (1) as a precautionary measure against misinterpretation of (H).

That as to the fourth, fifth and sixth, the Court cannot so say that those items were in the legislative mind at the time and intended to be so construed.

As to rules of construction in arriving at the above conclusions, a proviso or sometimes an exception is employed out of abundant caution merely to explain the general words of the enactment and to guard against a possible construction that is not intended. 50 Am. Jur. p. 457, sec. 436. Such construction of a proviso should be adopted as is consistent with, and not repugnant to, the body of the act. Ibid, p. 460, Sec. 440. As to decisions rendered subsequent to adoption see ibid, p. 475, sec. 460. As to applications to new conditions and subjects since the adoption of the statute, see ibid, p. 224, sec. 237. As to the rule of "expressio unius est exclusio alterius," see ibid, p. 240, secs, 245 and 246.

It is pointed out in one of the briefs that "the thing of value actually conferred on employees by means of SUB Plans is unemployment insurance coverage;" that study of §4141.01 (H) (1) R. C., shows that the legislature "intended to exclude from the definition of 'remuneration' payments made by employers under certain pay-as-you-go insurance plans and (more importantly here) the employer's contribution to certain insured and funded insurance plans." The problem then becomes: did the legislature use the list in (1) for "restrictive purposes to omit some plans or employed it for purposes of illustration and emphasis to indicate generally the various types of insurance plans excluded from the definition"? As pointed out, every type of insurance plan for employees that was known when the definition was formulated was mentioned, and this is strong evidence that the legislature did not intend to exclude any type of insurance plans. "Plainly it intended at once to indicate that insurance plans generally were excluded from the definition of 'remuneration' and to be sure all of them were excluded by mentioning all types then known," This is a strong argument and

entitled to great weight. It is also pointed out that looking at the SUB Plan from the insurance standpoint, the remuneration, if any exists, which the employee receives is not for the week he receives benefits from the state fund, because SUB benefits are paid from the fund only on exchange for credit units, and the latter are credited to the employee daily as he works at his employment; once credited to the employee's account, they vest in the employee absolutely. Hence the insurance coverage afforded by SUB Plans is represented by credit units which are earned and which are paid or credited to the employee daily for services performed. "Remuneration" in this form is both earned and transferred to the employee daily in periods when he actively engaged in performing services for the employer, not in periods of layoff when he may be eligible for state benefits. Looking at SUB, therefore, from the point of view of the Plan being unemployment **insurance coverage**, the conclusion must be that the benefit payments are not deductible, not being within the scope of remuneration.

We come now to a consideration of §4141.30 (C) R. C., which reads as follows:

"Benefits are payable to each partially unemployed individual otherwise eligible on account of each week of involuntary partial unemployment after the specified waiting period in an amount equal to his weekly benefit amount less that part of the remuneration payable to him with respect to such week which is in excess of two dollars increased to the next higher even multiple of one dollar."

This section was enacted into law as part of the 1941 amendments to conform to the Federal law in substantially the same language as above.

Sec. 4141.01 (N) R. C., defines a "partially unemployed worker" as one "in any week if, due to involuntary loss of work, the total remuneration payable to him for such week is less than his weekly benefit amount." In the original act (Sec. 1, (p) 116, O. Laws, Pt. II, page 289) " 'Partial unemployment' means part time employment resulting in loss of wages amounting to forty per cent, or more of an employee's average weekly wages." Likewise in the latter act, total unemployment —"means the condition caused by the inability of the employee * * * to obtain work in his usual employment, * * * and whose lack of employment causes total loss of wages"; whereas under §4141.01 (M) R. C., "an individual is 'totally unemployed' in any week during which he performs no services and with respect to such week no remuneration is payable to him. It is clear that under the original enactment wages and benefits, so far as the employee was concerned, were synonymous, for the benefits payable were fixed by percentages with certain maximums and without regard to any earnings the unemployed worker could pick up, so long as he could keep qualified (see Sec. 8[a], [b] pp. 294 and 295). The adoption of the 1941 amendments changing the wording of the various sections was evidently designed to apply any earnings in the present week for which he receives benefits as a credit against those benefits. The reason is obvious. But to assert that the legislature in so doing intended to reach out and give "remuneration" the meaning contended for is to put a strained and unnatural interpretation upon the language used.

It is urged in one of the briefs:

"Supplemental unemployment benefits payable under the Plan constitute compensation or remuneration for services, though they do not represent compensation for work actually done (other than the efforts put forth by the applicant in order to qualify) because:

"(a) During layoff, he remained (potentially) an employee, by virtue of the collective bargaining agreement and the Plan itself.

"(b) Supplemental, etc. benefits are based upon and constitute (partial) remuneration for loss of wages as an employee; and

"(c) 'Service' has the same meaning in the Ohio law as in the Federal law, as both are parts 'of a national plan of unemployment compensation.' That meaning embraces the entire employer-employee relationship for which compensation is paid, including employment in a stand-by capacity."

It is, of course, true that the rule of construction that the adoption of a statute from another jurisdiction carries with it the prior construction of the originating state is regarded as strong, persuasive and of great weight, but it is also true that where the statute is not taken verbatim or in toto and where the statute is given a different setting in the adopting state, the courts of the latter do not follow the other construction blindly. Also, the interpretation of an adopted statute by decisions of date subsequent to that of the adoption cannot be said to have been adopted with the statute (The Nierotko case was decided in 1945). 50 Am. Jur. p. 471, et sec. secs. 458, 459, 460, 462. The construction contended for also ignores other provisions of the Ohio Act, §4141.31 and §4141.36 R. C., and others as discussed above. It seems to the Court that that construction is much too broad. It would seem that "compensation for personal services," if it exists at all as to these fringe benefits, exists only in connection with the employer's current payments to an insurance or pension fund as a result of which the employee is eligible to coverage during his working lifetime, even if he never becomes a recipient of benefits. As stated in one of the briefs: "It is the coverage (and the current payroll costs of providing that coverage)—not the ultimate and contingent pay-out of a benefit which is provided in exchange for personal services; and it is then only (i. e. at the time of payment for the coverage) that there is any element of 'remuneration' or 'compensation for personal services.'" As applied to SUB benefits, they are what are provided against the hazard of loss of "compensation for personal services" and cannot, therefore, of themselves be "compensation for personal services."

Sec. 4141.31 R. C., reads in full as follows:

"(A) Benefits payable for any week shall be reduced by the amount of remuneration a claimant receives with respect to such week in any of the following forms:

"(1) Remuneration in lieu of notice;

"(2) Compensation for temporary partial disability under the workmen's compensation law of any state or under a similar law of the United States;

"(3) Old age benefits under title II of the 'Social Security Act,' as amended, or similar payments under any act of congress;

"(4) Retirement or pension benefits in the form of life annuity payments made by or on behalf of an employer after termination of employment in accordance with exclusively employer-sponsored and financed retirement plans or pension agreement.

"(B) No benefits shall be paid for any week with respect to which or a part of which an individual has received or is seeking unemployment benefits under an unemployment compensation law of any other state or of the United States, or for any week with respect to which he has received or is seeking remuneration from any federal system of unemployment or readjustment allowances for individuals discharged from the land or naval forces of the United States; provided the disqualifications shall not apply if the appropriate agency of such other state or of the United States finally determines that he is not entitled to such unemployment benefits."

Although these matters are not labeled or designated as an exception to the provisions of the act providing for benefits to workers, they are nevertheless to be considered as exceptions and limitations upon the general language. 50 Am. Jur. p. 451, sec. 431. If benefits payable for any week are to be reduced by the amount of remuneration a claimant receives with respect to such week in the forms listed above, then they are **not** to be reduced by the amount of remuneration he receives in any other forms, except as required by the reasonable interpretation of §4141.01 G & H, R. C., that is, for wages or earnings in cash or its equivalent. So called fringe benefits (excepting such as are not directly paid as the equivalent of wages such as vacation pay and back pay) unless required to be deducted from benefits by the terms of the above subsection .31 are not to be valued and deducted. This section is to be strictly construed, as shown in Moore v. Board of Review, 165 Oh St 526, 138 N. E. 2d 245 (1956).

Sec. 4141.36 R. C., reads as follows and is substantially the same as in the original enactment:

"No agreement by an employee to pay any portion of the contribution or other payment required to be made by his employer under §§4141.01 to 4141.46, inclusive, R. C., is valid. No employer shall make a deduction for such purposes from the remuneration or salary of any individual in his employ. Such sections do not affect the validity of voluntary arrangements by which employees individually or collectively agree to make contributions for the purpose of securing benefits in addition to those provided by §§4141.01 to 4141.46, inclusive, R. C."

It is to be noted that nothing contained in §§4141.01 to 4141.46, inclusive, R. C., shall be construed in any way to affect the validity of the voluntary arrangements mentioned in the last sentence. Any arrangement by which employees either individually or as a group collectively agree to make contributions for the purpose of securing benefits in addition to those provided for in the above-mentioned sections of the act are to be held valid and enforcible. The word "contributions" in this sentence is to be used in a different sense than used in §4141.01 (L) R. C., where it is defined as "the money payments to the state unemployment compensation fund required by §§4141.01 to 4141.46, inclusive,

R. C." "Contributions" as here used merely means "money payments," as obviously the rest of the definition could not apply to **voluntary** agreements. Likewise, "benefits" is to be used in a different sense than defined in §4141.01 (C) R. C., where it means "money payments payable to an individual who has established benefit rights, as provided in §§4141.01 to 4141.46, inclusive, R. C., for loss of remuneration due to his unemployment "benefit rights" being defined in (D) as the weekly benefit amount and the maximum benefit amount that may become payable to an individual within his benefit year as determined by the administrator or his deputy. "Benefits" as used here in .36 may take the form of money or other beneficial advantages or arrangements but they are in addition to the state benefits. It is to be noted that the SUB Plan provides that an employee is eligible only if he qualifies under the State Act, so we are not concerned here whether the question whether the terms of the "voluntary arrangement" mentioned must require qualification by the employee under the statutes. **Sec. 4141.01 R. C.,** requires the meaning of various terms and words used in the Act to be as set out, "unless the context otherwise requires." Note that the employees may "agree" to make contributions, etc. Agree with whom? With the administrator? Perhaps so, if the act be construed to give the administrator that power, but there is nothing in the Act permitting the administrator to pay out benefits larger than prescribed in the statute. There is nothing in the Act or the section limiting the right of the employees to agree with anyone they desire. The power is reserved to them to agree collectively with anyone they choose to make money credits or other forms of payments to a fund for the purpose of securing benefits in addition to those conferred by the Act. In the case at bar, they have entered into voluntary arrangements with their employers by which they agree to make credits into the Trust Fund, etc. And how do they do that? A minute portion of the daily service rendered by the employee is in fact his money payment in terms of labor towards the Fund. Collectively he has agreed through his sole bargaining agent under the National Labor Relations Act that a small quantity of his daily labor (not by any means necessarily measured in terms of 3c per hour) translated into monetary terms is his contribution in order to secure benefits in addition to those provided in the unemployment compensation act. His right to contract freely for his labor is preserved by this section. If the statute be construed the other way, we face grave constitutional questions. In the instant case he has by the SUB Plan exercised his right recognized by the State freely to contract his hire on such terms as he sees fit to bargain for and entirely within the provisions of the Act. It follows that so far as the construction of the statute is concerned the SUB benefit payments are not remuneration as defined in §4141.01 (H) R. C., and are not deductible.

In U. S. v. Carter, 353 U. S. 210, (1957) I L. Ed. 2d 776, 77 S. Ct. 793, the Supreme Court stated:

"It is undisputed that if the collective bargaining agreement had required the contractor to pay each employee 7½ cents per hour above the prevailing wage rate and the employee had, by contract with

his bargaining representative, agreed to contribute that sum to the fund, the surety would have been obligated to make good any default in the contractor's payment of that extra 7½ cents per hour."

In other words, the mere form or setup in which the increments to the Trust Fund are made is immaterial; what is important, in accordance with the thought in the above quotation, is the substance of the "voluntary arrangement."

In **Railway Co. v. Cox, 55 Oh St 497,** 45 N. E. 641, Judge Spear delivering the opinion, on **page 510** said:

"It is to be assumed that the legislature intended to confine its action in forbidding the making of contracts upon subjects in themselves lawful, by persons sui juris, to such contracts as are inimical to the state, that is, against public policy, for the right to contract is one not given by legislation, but inherent, necessarily involved in the ownership of property and as a primary prerogative of freedom (2 Wharton on Contracts, section 1061), and we should not construe the words of an act so as to restrain this right, where the conflict with public policy is not clear, unless the language will bear no other construction."

And on page 515, he points out that contracts similar in every essential particular to the one involved therein were sustained by the courts of five other states. In the instant case, while SUB has not been passed upon by the Courts, it has been allowed and paid to workers without deduction in 38 states, the District of Columbia and Hawaii, this by administrative fiat or attorney general's opinion, including Wisconsin from which law considerable of our Act came; contrawise are Indiana (by statute), Ohio, North Carolina and Virginia (by statute).

It remains to consider whether the public policy, if there be one, of the State requires a contrary conclusion. It is claimed that Ohio has a public policy upholding the administrator's ruling by reason of the recent history of the statute and the actions of the legislature relative to proposed amendments, as well as the result of the vote of the people upon an initiated bill.

It is urged that the voters of the State in November, 1955 by a vote of 1,481,339 to 865,326 defeated a proposed law which would amend §4141.01, et seq, R. C., to provide for SUB payments and a number of other particulars. The summary of the proposal upon the initiative petition as certified by the Attorney General (PX-3) is too lengthy to quote here but may be summarized briefly as:

(1) to increase weekly benefits according to specified scale;

(2) to increase the maximum number of weeks a claimant could receive benefits from 26 to 39;

(3) to increase allowances for dependent children;

(4) to provide for a guaranteed period wage plan;

(5) to provide for additional benefits whenever the administrator shall find unreasonable delay by an employer on a claim, and other procedural changes.

It is, of course, not possible to determine which one or ones of the above package deal the voters aimed their guns at—perhaps all of

them, no one can tell. (See Staff Research Report No. 22, Ohio Legislative Service Commission, Feb. 1957.) For that reason it is impossible for the Court to draw a conclusion that the result establishes a public policy of the state against any one particular item, especially when one of them is labeled a guaranteed period wage plan. The campaign material used by both sides is interesting and colorful reading but of no help on the legal question involved.

Various bills in the legislature dealing with the subject matter are in evidence. H. B. 223, S. B. 365 and Sub. H. B. 223, all of them in the 102nd General Assembly Regular Session, 1957-1958, the former two being introduced expressly to permit supplementation in 1957, and the latter to prohibit the same, none of these bills having been adopted. The report of the sub-committee dealing with unemployment compensation (Deft, Ward's X-7) had this to say to the Industry and Labor Committee:

"1. **SUPPLEMENTAL UNEMPLOYMENT BENEFITS.** It is the opinion of the sub-committee that the present law of Ohio does not necessarily preclude the payment of benefits under all supplemental unemployment plans. There are presently in effect in Ohio numerous contracts calling for the payment of supplemental benefits. These contracts differ one from the other. In addition to the contracts already executed the committee recognizes that additional contracts may be executed in the future which will approach the problem in an entirely different fashion. It is the opinion of the sub-committee that the Ohio Assembly should not interfere with provisions of contracts previously negotiated between employers and employees. At the same time the sub-committee feels that it should not recommend changes in existing statutes merely to accommodate the plan or plans of one or more employers. This reason also precludes a recommendation that certain types of supplemental payments be differentiated by excluding them from the definition of remuneration or wages under the Ohio Unemployment Insurance Law. Therefore, the sub-committee did not include in its recommendations any changes in existing statutes which would facilitate or negate the payment of supplemental unemployment benefits.

The Ohio State Advisory Council on Unemployment Compensation urged the legislature to amend the law to "clarify the supplemental unemployment pay (SUB) issue." The Council on page 6 of its Legislative Recommendation, May, 1957 (Plaintiff's Brief page 65), stated:

"There will be continued state of uncertainty in respect to the benefit rights of thousands of workers and some of Ohio's largest employers will be placed in a difficult position in their labor relations. These adverse effects . . . will be intensified in those cities where negotiated contracts provide for supplemental unemployment pay.

"The problems which could, and probably will, arise in the absence of a clear-cut statement of legislative intent are many. These and similar possibilities and others not yet foreseen could cause considerable confusion and uncertainty. The paperwork, the litigation, the ill-will and confusion could seriously impair what is a sound and valuable public program. If the above events should develop at a time

of serious recession when the workload was already seriously heavy (a not unrealistic assumption) Ohio would surely regret its failure to deal clearly and positively with a vital issue."

The Court cannot find any public policy against SUB Plans or the paying of SUB benefits without deduction from state benefits; on the contrary, they are legal, unprohibited and entirely within the law, statutes or otherwise, in Ohio. Western Reserve Law Review, Vol. 7, p. 436, et seq., Sept. 1956 is a general discussion of the subject.

Coming now to the affirmative defense and cross-petition of defendant The C. E. Morris Company the cross-petition of defendant Donald R. Smith and the cross-petition of defendant Richard H. Ward, the Court finds on the issues joined under all the evidence and upon the merits for plaintiff and defendant steel corporations. If SUB is or is to become too burdensome for smaller industry to bear, if the effect of SUB is to cause labor to gravitate to and stay with the large employer who has SUB, if the employee who probably will never receive SUB by reason of seniority or his type of work or otherwise thus receives nothing in return for his amount of labor contributed toward the trust fund through the employer, if the State Fund will be diminished at a faster rate when SUB is not deducted, then these and other similar economic problems involved must be addressed to the legislature. The Courts do not make the laws—they merely interpret the laws which the legislature (the people's representatives) enact.

The Court finds under the law and all of the evidence as to the issues raised in the prayer of the petition as follows:

1. The Ohio Unemployment Compensation Law does not forbid but permits the operation of the Supplemental Unemployment Benefit Plan negotiated by the Union with these corporate Defendants.

2. Supplemental Unemployment Compensation Benefits, payable to eligible employees of the respective corporate Defendants from the irrevocable trust fund established under the Plan do not constitute "remuneration" within the meaning and intent of the Unemployment Compensation Law of Ohio, and the Administrator and said other Defendants do not have the legal right to reduce the amount of state benefits by the amount the employee receives under the Plan.

3. The said Supplemental Unemployment Benefit Plan and Agreement is a collective agreement to make contributions for the purpose of securing benefits in addition to those provided by §§4141.01-4141.46, inclusive, R. C.

4. Said Supplemental Unemployment Benefits, if remuneration, do not constitute compensation or remuneration with respect to the same week or period for which state benefits are paid.

5. Benefits under the said Supplemental Unemployment Benefit Plan and Agreement may be paid in accordance with the terms and provisions thereof without reducing the amount of state benefits which any such employee might become eligible to receive under the Ohio Unemployment Compensation Law.

Order on the Administrator and his deputies as prayed for and permanent injunction granted in accordance with prayer. Judgment for

costs one-half against Plaintiff and one-half against defendant steel corporations, this under §2721.11 R. C.

A journal entry may be prepared by counsel in accordance herewith.